# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TAMIKA BROCK,

    *Plaintiff*,

    v.

STATE OF CONNECTICUT DEPARTMENT OF
MENTAL HEALTH AND ADDICTION
SERVICES, AND LORI OREND,

    *Defendants*.

No. 3:20-cv-01889-MPS

## RULING ON DEFENDANTS' MOTIONS TO DISMISS

Tamika Brock brings this civil rights action seeking damages against her former employer, the Connecticut Department of Mental Health and Addiction Services ("DMHAS"), and her former supervisor, Lori Orend.[1] Brock alleges that DMHAS violated her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Connecticut state law. She also alleges that Orend, in her individual capacity, committed common law battery and violated her First Amendment rights. The Defendants have moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF Nos. 29, 41. For the reasons set forth below, I GRANT in part and DENY in part the motions.

---

[1] Mary Beth Jordan is not a defendant in this suit. Although the complaint mentions Jordan a few times, including once under the heading "Parties," Jordan is not named as a defendant in the caption. *See* FED. R. CIV. P. 10(a) ("The title of the complaint must name all the parties . . . ."). Nor is there any evidence that Brock served her with the summons and complaint. Therefore, I will not treat her as a defendant or discuss her further.

## I.     BACKGROUND

The factual allegations below are taken from Brock's third amended complaint, ECF No. 27, and I accept them as true for the purposes of this ruling.

### A.  Factual Allegations

Tamika Brock is a licensed clinical social worker. ECF No. 27 ¶ 5. She was hired to work for DMHAS in the Department's Norwich, Connecticut office in September of 2018. *Id.* ¶ 8. At the time she was hired, Lori Orend was her immediate supervisor. *Id.* ¶ 9. Upon being hired to work for DMHAS, Brock, who the complaint describes as "African American/Black/Latina," was immediately confronted with conflicting instructions and inadequate training regarding DMHAS's protocols and procedures, and DMHAS was unwilling to provide guidance or clarification. *Id.* at ¶¶ 10-11. On one occasion, after Brock "expressed her concerns about the training and supervision that she was receiving," Orend stormed out of the meeting, saying, "I'm not supervising her." *Id.* ¶ 13. Orend also questioned Brock's "competency as a social worker" after Brock asked a question. *Id.* ¶ 16. The complaint alleges that "there seemed to be special rules for [Brock] . . . [Brock] was told to leave her door open while other similarly situated white employees were not similarly instructed," and she was told to do or not do things that were inconsistent with what her white coworkers were being told. *Id.* ¶¶ 17-18. The complaint also alleges that, at one point, "a client was asked if he would object to a Black female therapist," *id.* ¶ 11, and that, on another occasion, a letter sent to Brock by a suicidal client was intercepted and opened without Brock's knowledge— a breach that implicated Brock's professional license. *Id.* ¶ 20.

In response to this "toxic discriminatory environment," Brock filed two complaints with DMHAS's Affirmative Action Office. *Id.* ¶ 21. Those complaints were filed "around February 11, 2019 and . . . on March 18." *Id.* After filing those complaints, Brock alleges that on March 21,

2019, she was printing documents related to the complaints when she encountered Orend standing next to the printer and holding the documents. *Id.* ¶¶ 24-25. "A verbal exchange [then] occurred," and according to the complaint, "[Orend] then thrust her elbow into [Brock]'s side causing observable bruising and contusions." *Id.* ¶¶ 26-27. Shortly thereafter, on April 9, 2019, Brock was transferred from the Norwich office to the Hartford office. *Id.* ¶ 30.

The complaint alleges that "upon information and belief," Brock's supervisors in the Hartford office were aware of the affirmative action complaint she had filed. *Id.* ¶ 31. Consequently, when Brock arrived at the Hartford office, she once again found herself in a cold and unwelcoming workplace. *See, e.g.*, *id.* ¶ 36 ("[Brock] was being intentionally isolated, segregated, excluded, under-utilized and not allowed to exercise the functions of her job."). Brock also alleges that, upon being transferred, the substantive duties of her work changed, as she "was limited to answering the telephone, and was not allowed to practice her profession as a Clinical Social Worker." *Id.* ¶ 34. On May 22, 2019, Brock filed a complaint with the Connecticut Commission on Human Rights and Opportunities. *Id.* ¶ 37. On September 13, 2019, Brock was transferred again, this time to the office in Middletown. *Id.* ¶ 43.

Brock alleges that her position in the Middletown office offered "fewer hours per week at a lower rate of pay." *Id.* ¶ 44. Around the time Brock was transferred, she also began experiencing problems with her foot. *Id.* ¶ 45. The complaint alleges that, because of Brock's injury, DMHAS placed Brock on a forced leave of absence from October 1 to November 1, 2019.[2] *Id.* ¶¶ 48, 54. Brock alleges that when she returned to work, she encountered increased hostility from her coworkers. She alleges that the office secretary discussed "how she [was] 'sick of minorities,'"

---

[2] The complaint contains additional allegations concerning DMHAS's failure to accommodate this injury. As I explain further below, because I dismiss the claim of disability discrimination under Connecticut General Statutes § 46a-60 on jurisdictional grounds, I have omitted these allegations.

and "frequently complained about affirmative action to [Brock]." *Id.* ¶ 57. And she alleges that her supervisor was likewise hostile. *See id.* ¶ 58 ("Plaintiff has been told that she is not allowed to briefly stand to stretch or even to use the bathroom."). On one occasion, Brock fell and suffered a concussion in the office causing her to miss a meeting with her supervisor. Upon finding Brock dazed in her office, the supervisor admonished Brock for missing the meeting and refused to call her an ambulance. *Id.* ¶¶ 66-69. The fall caused Brock to take another leave of absence, this time from March 5 to December 1, 2020. *Id.* ¶¶ 73, 75. Brock alleges she was ready to return to work as early as September 1, 2020, but at that time, DMHAS placed her on a three-month period of administrative leave while it investigated whether she had violated workplace rules on the day she fell. *Id.* ¶ 75. On September 17, 2020, Brock filed one of two whistleblower complaints with the Connecticut Commission on Human Rights and Opportunities. Finally, on October 15, 2021, DMHAS terminated Brock.

### B. Procedural History

Brock filed her initial complaint on December 18, 2020, bringing claims of both employment discrimination and retaliation against DMHAS under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). ECF No. 1 ¶¶ 27-28. Since then, Brock has sought to amend her complaint three times. ECF Nos. 16, 18, 22. Brock attached a copy of her proposed complaint to her most recent motion to amend. ECF No. 22. The proposed complaint contained three additional counts—a hostile work environment claim under Title VII against DMHAS, a disability discrimination claim under Connecticut General Statutes § 46a-60 against DMHAS, and a state law battery claim against Lori Orend. *Id.* at 15-16. In seeking leave to amend, Brock's motion argued that "Counsel for [DMHAS] . . . indicated no opposition to the motion . . . ." ECF No. 22 at 1. On March 1, 2022, Judge Charles S. Haight granted Brock's motion

to amend, noting DMHAS's consent to the added Title VII and § 46a-60 counts and finding that the battery count against Orend satisfied Federal Rule of Civil Procedure 15(a).[3] ECF No. 25 at 11-12. Brock subsequently filed an amended complaint on the docket on March 17, 2022. ECF No. 27. But this complaint (the operative complaint) was not the proposed complaint provided to the Court with Brock's motion to amend. In addition to the counts Judge Haight considered and approved, this complaint contained two *additional* counts that were never consented to by the Defendants or approved by the Court—or even proposed. *Id.* at 14-15; *see also* FED. R. CIV. P. 15(a)(2) ("In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."). As a sanction for misconduct, the Defendants urge me to dismiss the two additional counts, which include a claim against DMHAS under Connecticut General Statutes §31-51q, which creates a cause of action for employees who are disciplined or discharged on account of their protected speech, and a First Amendment retaliation claim under Section 1983 against Orend.[4] *See* ECF No. 29 at 1. Both the Defendants have filed motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF Nos. 29 and 41.

## II.    LEGAL STANDARD

To avoid dismissal under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). I accept as true all of the complaint's factual allegations when evaluating a motion to dismiss, *id.*, and must "draw all reasonable inferences in favor of the non-

---

[3] Federal Rule of Civil Procedure 15 says, in part, "The court should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2).

[4] I address this apparent misconduct further below.

moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* In adjudicating a motion to dismiss under Rule 12(b)(1) on the pleadings, the court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor" except for "argumentative inferences favorable to the party asserting jurisdiction." *Buday v. New York Yankees P'ship*, 486 F. App'x 894, 895 (2d Cir. 2012).

## III.    DISCUSSION

### A.  Title VII Racial Discrimination Claim

Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The complaint alleges that DMHAS "discriminated against Plaintiff in the terms and conditions of her employment, in that, [DMHAS] poorly evaluated Plaintiff, demote[*sic*] her, delegated Plaintiff unequal duties, delegated Plaintiff difficult assignments, harassed Plaintiff, and inadequately trained Plaintiff on the basis of her race and color." ECF No. 27 at 13.

To plausibly state a claim for Title VII discrimination, Brock must allege "(1) that she is a member of a protected class, (2) that she was qualified for the position . . . , (3) that she suffered

an adverse employment action, and (4) . . . facts suggesting an inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). Such facts "need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Id.*

DMHAS does not dispute that Brock was a member of a protected class, and the complaint plausibly alleges that she was. *See* ECF No. 27 ¶ 5 ("Plaintiff, Tamika Brock, is an African American/Black/Latina female."). Likewise, DMHAS does not dispute that Brock was qualified for her position, and the fact that Brock was a "licensed" clinical social worker, *id.* ¶ 5, and that DMHAS chose to hire her, *id.* ¶ 8, suggest that she was qualified. However, DMHAS disputes that some of the actions described in the complaint plausibly allege an adverse employment action. ECF No. 29-1 at 8. DMHAS also disputes that the complaint has plausibly alleged a discriminatory motive for any adverse employment action. *Id.* at 10. I disagree with DMHAS as to the first point. But I agree with DMHAS that Brock has failed to allege a discriminatory motive.

In the context of a Title VII discrimination claim, an adverse employment action "is a materially significant disadvantage with respect to the terms of the plaintiff's employment." *Littlejohn*, 795 F.3d at 312 n.10 (internal quotations and alterations omitted). It is not a "mere inconvenience or an alteration of job responsibilities." *Id.* "Examples of materially significant disadvantages include termination, a demotion, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities." *Id.* (internal quotations and alterations omitted).

DMHAS argues that some of the allegations in the complaint "do not rise to the level of adverse employment actions." ECF No. 29-1 at 8. It argues that "allegations of excessive scrutiny,

monitoring, and criticism of [one's] job performance do not constitute an adverse employment action." *Id.* at 9. But Brock's complaint alleges more than mere scrutiny or criticism. It alleges that she was transferred to other offices where her job responsibilities, pay, and hours were reduced. *See* ECF No. 27 ¶ 34 ("[After being transferred to the Hartford office,] Plaintiff was limited to answering the telephone, and was not allowed to practice her profession as a Clinical Social Worker."); *id.* ¶ 44 ("The position that Plaintiff was transferred to at [Middletown] was a lower job with fewer hours per week at a lower rate of pay."). Moreover, it alleges that DMHAS fired Brock. *Id.* ¶ 77. These are all allegations of adverse employment actions. *See Buon v. Spindler*, 65 F.4th 64, 80 (2d Cir. 2023) ("[I]t is well settled that 'firing' and 'reassignment with significantly different responsibilities' constitute adverse employment actions.").

Brock has also alleged that she was denied training. ECF No. 27 ¶ 11. It's reasonable to infer that such training was material, if not essential, to her ability to perform her duties as a social worker. *See id.* ("Defendant did not endeavor to train Plaintiff on intakes, discharges, treatment plan[ ] expectations, and other protocols and procedures . . . ."). DMHAS argues that inadequate training is an adverse employment action only where "the conditions of [ ] employment are thereby harmed," ECF No. 29-1 at 9 (citing *Carpenter v. City of Mount Vernon*, 198 F. Supp. 3d 272, 279-80 (S.D.N.Y. 2016)), and that Brock has not alleged any material harm as a result of the alleged denial of training. *Id.* I disagree. Brock was subsequently transferred to the Hartford office where, she alleges, she "was not allowed to practice her profession as a Clinical Social Worker." ECF No. 27 ¶ 34. I must draw all reasonable inferences in Brock's favor. It is reasonable to infer that this alleged transfer occurred *because* Brock was inadequately trained. Such an inference is supported by the allegation that Orend questioned Brock's "competency as a social worker" around this same

time. *Id.* ¶ 16. Brock has therefore plausibly alleged that she suffered an adverse employment action due to DMHAS's refusal to train her.

Nonetheless, the pleadings do not give rise to a reasonable inference that any adverse employment action was imposed *because of* Brock's "race, color, religion, sex, or national origin." As the Second Circuit has long recognized, "the ultimate issue in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an impermissible reason, *i.e.*, a discriminatory reason." *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (internal quotations omitted). Because proof is not required at the pleadings stage, a complaint demonstrates this discriminatory motive "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.*

The complaint alleges that Brock faced some racial animus. One of Brock's clients "was asked if he would object to a Black female therapist." ECF No. 27 ¶ 11. Brock does not allege who asked this question and does not specify when this occurred, but given this allegation's placement in the complaint, it is reasonable to infer that it occurred while Brock worked in the Norwich office, i.e., between September 2018 and April 9, 2019. Some time after she was transferred to the Middletown office, i.e., after September 13, 2019, a secretary in that office complained to Brock about "minorities" and "affirmative action." *Id.* ¶ 57. These are, however, the only references to direct expressions of racial animus in the complaint. I cannot infer from these allegations that any adverse employment action imposed on Brock was due to her race because Brock alleges no facts suggesting a connection between these stray remarks and her transfers, the reduction in her responsibilities, or her discharge. Brock's complaint does not allege that the individuals who made

these remarks were in a position to impose an adverse action on her employment. Nor does Brock

allege any facts suggesting that either of these remarks influenced a decisionmaker.[5]

The complaint also attempts to raise an inference of discrimination by alleging disparate

treatment. According to the complaint, Brock "was told to leave her door open while other

similarly situated white employees were not similarly instructed," and "not to have anything other

than client sessions on her calendar," though "[w]hite employees were not similarly instructed."

*Id.* ¶ 17. The complaint also alleges that "[t]here were many things [Brock] was being told to do

or not do that her white co-workers told her were not consistent with what they were being told,"

*Id.* ¶ 18, and that, unlike Brock, white "employees have in the past been allowed to return to work

after sustaining an injury . . . ." *Id.* ¶ 62. But these allegations similarly fall short.

"To establish an inference of discrimination, a plaintiff must allege that she was similarly

situated in all material respects to the individuals with whom she seeks to compare herself." *Brown*

*v. Daikin America Inc.*, 756 F.3d 219, 230 (2d Cir. 2014). What constitutes "all material respects"

varies from case to case, but there must at least be a "reasonably close resemblance" between "the

plaintiff's and comparator's circumstances." *Id.* None of the allegations cited above give rise to a

plausible inference that Brock's circumstances bore a reasonably close resemblance to the

circumstances of her white co-workers. Instead, the allegations are bereft of the minimum factual

---

[5] Brock's complaint alleges that "Mary Beth Jordan, the outpatient Director, kept a sign on a filing cabinet inside her office that reads 'Lady of the Manor.'" ECF No. 27 ¶ 19. Brock alleges that the term "lady of the manor" was "used in slavery as referring to the wife of the plantation owner or master." *Id.* It's reasonable to infer that Jordan had supervisory authority over Brock such that she was able to alter the conditions of Brock's employment. But I cannot infer racial animus on Jordan's part based on the sign alone. As the complaint notes, the term (and its "lord of the manor" corollary) originated and was primarily used in feudal England, though it is still used in England today. *See Lord of the Manor*, WIKIPEDIA, https://en.wikipedia.org/wiki/lord_of_the_manor (as of Aug. 14, 2025, 2:02 pm EST). Perhaps the term has also been used in a racially insensitive manner, but unlike terms such as "master" and "plantation," it does not connote clear ties to slavery. And given the variety of contexts where the term is used, it is not reasonable to infer that such a sign by itself reflects racial animus on the part of Jordan—especially when Brock has not alleged corroborating facts about Jordan's words or actions that would suggest that Jordan intended for the sign to communicate a racist message.

detail sufficient to make an inference of discrimination plausible. Brock does not identify any of her "white co-workers" or allege any of their job titles, departments, responsibilities, or supervisors. Nor does she allege any other facts that would allow me to reasonably infer that these co-workers shared similar circumstances and were therefore similarly situated to Brock. Though, on one occasion, Brock describes some of her white co-workers as "similarly situated," ECF No. 27 ¶ 17, that phrase, bereft of any factual detail, is conclusory, and I am not bound to accept such a conclusory allegation as true. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[W]e are not bound to accept as true a legal conclusion couched as a factual allegation."). I acknowledge that the "similarly situated" standard, at the pleadings stage, is a low one. *See Hu v. City of New York*, 927 F.3d 81, 97 (2d Cir. 2019) ("[I]n light of the inquiry's fact-intensive nature . . . we have cautioned against deciding whether two comparators are similarly situated on a motion to dismiss."). But Brock must still allege *some* facts to allow me to infer that any disparate treatment of her as compared to her white co-workers was plausibly attributable to discrimination. She has not.

Brock is not required to allege that racial animus was the "but-for" cause of the alleged adverse employment actions. But she must at least allege facts suggesting that racial animus was a motivating factor. *Vega*, 801 F.3d at 85 ("[A]n action is 'because of' a plaintiff's race, color, religion, sex, or national origin where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action."). She has failed to do so here. Neither the two stray racial remarks nor the vague allegations regarding DMHAS's treatment of Brock's co-workers give rise to the inference that Brock was under-trained, transferred, or otherwise mistreated *because of* her race. I therefore DISMISS with prejudice Count One of the complaint against DMHAS.

### B. Title VII Retaliation Claim

DMHAS has not argued that the Title VII retaliation claim, in particular, should be dismissed. But because it has moved to dismiss the complaint in its entirety, I address this claim nonetheless.

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Brock alleges that DMHAS violated this provision by treating Brock "differently than similarly situated employees who did not engage in protected activity of complaining about what she reasonably believed to be discriminatory behavior." ECF No. 27 at 13. The facts in Brock's complaint are sufficient to state a claim for retaliation under Title VII.

"For a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90. "[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotations omitted). This definition is broader than the "material harm" a plaintiff must allege in the discrimination context. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Because

12

Brock has plausibly alleged an adverse employment action in her discrimination claim, she has also alleged an adverse employment action under the retaliation claim's more permissive standard.

As to the second element, causation, "a plaintiff must plausibly plead a connection between the [adverse] act and his engagement in protected activity." *Vega*, 801 F.3d at 90. "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. G.E. Co.*, 252 F.3d 205, 207 (2d Cir. 2001) (internal quotations omitted). "Though [the Second Circuit] has not drawn a bright line defining . . . the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

Some of Brock's allegations are too remote to suggest causation. Brock alleges she filed a whistleblower complaint with the Connecticut Commission on Human Rights and Opportunities on September 17, 2020. ECF No. 27 ¶ 60. But the only adverse employment action the complaint alleges occurred subsequently was Brock's termination on October 15, 2021—over a year after the whistleblower complaint was filed. *Id.* ¶ 77. Nevertheless, other allegations in the complaint demonstrate temporal proximity. Brock alleges she filed her initial complaints with DMHAS's Affirmative Action Office on February 11 and March 18, 2019. *Id.* ¶ 21. Less than a month later, on April 9, 2019, she was involuntarily transferred to the Hartford office, where she occupied a position with materially reduced responsibilities. *Id.* ¶¶ 30, 34. She also alleges that, after being transferred to Hartford, she filed a complaint with the Commission on Human Rights and Opportunities "on or about" May 22, 2019. *Id.* ¶ 37. Then, on September 13, 2019, she was transferred again, this time to Middletown, where she received fewer hours and less pay. *Id.* ¶¶ 43, 44. On both occasions, the transfer was close enough in time to the filing of the complaint that one

could reasonably infer that the transfers were retaliatory. Accordingly, Brock has stated a claim for Title VII retaliation with regard to the two transfers.

### C.  Title VII Hostile Work Environment Claim

The language of Title VII does not explicitly bar "hostile work environments." Instead, Courts have interpreted 42 U.S.C. § 2000e-2(a)(1)—making it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin"—to bar employers from creating a hostile work environment on the basis of an individual's protected status. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (holding that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment"); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002) (applying *Meritor*'s hostile work environment framework to race-based harassment). Brock alleges that DMHAS's conduct created a hostile work environment. ECF No. 27 at 13.

A work environment is hostile when it "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). Determining whether a work environment is hostile is a fact-intensive inquiry. Courts should look at "all the circumstances . . . includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Brock has failed to state a claim for a hostile work environment under Title VII because the complaint contains no facts indicating that Brock was subjected to a hostile work environment due to her race. *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class."). As noted, Brock alleges two instances over a period of at least five months where racially insensitive remarks were made. ECF No. 27 ¶¶ 11, 57. These two isolated instances do not amount to a hostile work environment, *see Schwapp v. Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[F]or racist comments, slurs and jokes to constitute a hostile work environment, there must be a . . . steady barrage of opprobrious racial comments . . . ."), and Brock alleges no facts suggesting a connection between these remarks and any of the "hostile" actions she alleges—the battery and questioning of her competency by Orend, the inadequate training, the interception of a letter from a suicidal client, the instructions that she leave her door open and limit her calendar to professional appointments when her white co-workers did not receive those instructions, the transfers and reductions in her responsibilities, the isolation and the handling of her fall in the Middletown office. Nor does she allege other facts—apart from vague references to disparate treatment—connecting any of these workplace slights to her race. It is questionable whether this litany of events over a period of three years, even when construed in the light most favorable to Brock, was sufficiently "severe" or "pervasive" to amount to a hostile work environment at all, but because of the battery—a physical altercation—and material and successive reductions in her job responsibilities, I will assume that she has alleged events "severe" or "pervasive" enough to qualify. What she has not done is connect those events to her race, and so the hostile work environment claim fails. Because Brock has failed to state a Title VII hostile work environment claim, Count Three of the complaint is DISMISSED with prejudice.

### D. State Law Claims Against DMHAS

Brock alleges claims of disability discrimination under the Connecticut Fair Employment Practices Act ("CFEPA") and discharge or discipline on account of her protected speech under Connecticut General Statutes § 31-51q. CFEPA states in part, "It shall be a discriminatory practice in violation of this section (1) for an employer . . . to discharge from employment any individual or to discriminate against any individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . physical disability." CONN. GEN. STAT. § 46a-60(b)(1). Section 31-51q provides:

> [A]ny employer, including the state and any instrumentality or political subdivision thereof, who subjects or threatens to subject any employee to discipline or discharge on account of (1) the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution . . . shall be liable to such employee for damages . . . .

CONN. GEN. STAT. § 31-51q(b)(1).

These claims are barred by the Eleventh Amendment. As a state agency, DMHAS enjoys the protection against suit in federal court afforded by the Eleventh Amendment. *See Petre v. NYS Worker's Compensation Board*, No. 23-cv-1641 (EK) (MMH), 2025 WL 1311033, at *3 (E.D.N.Y. May 6, 2025) ("Actions brought against a state agency are actions against the state itself."). There are recognized exceptions to Eleventh Amendment immunity. "The primary exceptions . . . involve circumstances when the state has consented to suit in unequivocal terms or when Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity." *Tonina v. Connecticut Department of Revenue Services*, 851 Fed. App'x 273, 274 (2d Cir. 2021) (internal quotations omitted). In addition to waiver and abrogation, there is also the *Ex parte Young* exception. *Western Mohegan Tribe and Nation v. Orange County*, 395 F.3d 18, 21 (2d Cir. 2004) ("The doctrine of *Ex parte Young* is a limited exception to the general principle of sovereign immunity. It allows a suit for injunctive or declaratory relief challenging

16

the constitutionality of a state official's actions in enforcing state law.") (internal quotations and alterations omitted). But none of these exceptions applies here.

Though the terms "sovereign immunity" and "Eleventh Amendment immunity" are often used interchangeably, Eleventh Amendment immunity is a particular species of sovereign immunity. Whereas sovereign immunity protects a state from suit generally, Eleventh Amendment immunity protects a state from suit *in federal court*. *Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015) ("Eleventh Amendment immunity [is] immunity of a state's treasury from claims for damages brought by private entities in federal courts . . . States also enjoy a broader sovereign immunity, which applies against *all* private suits, whether in state or federal court.") (emphasis in original). "Thus, it is important to keep in mind that a state may waive its common law sovereign immunity without waiving its Eleventh Amendment immunity under federal law." *Garris v. Dep't of Corr.*, 170 F. Supp. 2d 182, 187 (D. Conn. 2001) (internal quotations omitted). "A state may consent to being sued in its own courts, while still retaining Eleventh Amendment immunity from suit in federal court." *Id.* If a state does consent to suit in federal court, that consent must be "unequivocally expressed." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).

Brock argues that, as to the Section 31-51q claim, the "State of Connecticut has no sovereign immunity to avoid suit when there is a federal question posed by allegations pled in the complaint." ECF No. 32 at 14. She also argues that "[i]n permitting the amendment of Plaintiff's complaint, the court has already concluded that it may exercise supplemental jurisdiction over Plaintiff's state law CFEPA claim." *Id.* at 10.

Brock is correct that the Court, in granting Brock's motion to amend, stated that it had supplemental jurisdiction over the CFEPA claim. ECF No. 25 at 2 ("[T]he Court has supplemental

17

jurisdiction over Count Four. That count, alleging disability discrimination against DMHAS under Connecticut General Statutes § 46a-60, is so related to Plaintiff's Title VII claims that it forms part of the same case or controversy under Article III of the United States Constitution, 28 U.S.C. § 1367(a)."). But that does not preclude an opposing party from subsequently contesting the count on Eleventh Amendment grounds or me from dismissing the count on those grounds. Questions of Eleventh Amendment immunity may be raised at any time. *McGinty v. New York*, 251 F.3d 84, 94 (2d Cir. 2001) ("[T]he Supreme Court and [the Second Circuit] have repeatedly held that a state may assert Eleventh Amendment sovereign immunity at any time during the course of the proceedings."). And it is well-established that 28 U.S.C. § 1367 must yield to the Eleventh Amendment. *Raygor v. Regents of University of Minnesota*, 534 U.S. 533, 541 (2002) ("[W]e cannot read § 1367(a) to authorize district courts to exercise jurisdiction over claims against nonconsenting States . . . ."). As to Brock's argument that a state is not immune when the complaint poses a federal question, she cites no authority for that notion, and there is ample authority that Section 31-51q is not explicit enough to waive a state's Eleventh Amendment immunity, even when the cause of action is based on speech protected by the First Amendment. *See, e.g.*, *Cromartie v. Dep't of Corr.*, No. 3:21-cv-01236 (JBA), 2022 WL 4237072, at *2-3 (D. Conn. Sept. 14, 2022) (dismissing the Plaintiff's Section 31-51q claims against Connecticut under the Eleventh Amendment).

As for CFEPA, while Connecticut has consented to be sued under CFEPA, *see* CONN. GEN. STAT. § 46a-51(10) ("'Employer' includes the state and all political subdivisions thereof . . . ."), that consent to suit is limited to the State's own courts:

> Any person [who has exhausted CFEPA's administrative remedies] may bring an action in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred, the judicial district in which the respondent transacts business or the judicial district in which the complainant resides, except

any action involving a state agency or official may be brought in the superior court for the judicial district of Hartford.

*Id.* at § 46a-100. Neither this provision, nor the other provisions of CFEPA, unequivocally express consent to be sued in federal court. *See Garris*, 170 F. Supp. 2d at 187 ("Although [the Plaintiff] may be correct that the State waived its common-law sovereign immunity for CFEPA claims by the express statutory language . . . there is nothing in the Connecticut Statutes that constitutes an express waiver of Eleventh Amendment immunity for CFEPA claims.").

The sum of decisions in this district favors immunizing Connecticut against these state law claims.[6] *See, e.g.*, *id.* (dismissing the Plaintiff's CFEPA claims against Connecticut under the Eleventh Amendment); *Mallison v. Connecticut Office of Early Childhood*, 634 F. Supp. 3d 21, 39 (D. Conn. 2022) (same); *Pawlow v. Dep't of Emergency Servs & Pub. Prot.*, 172 F. Supp. 3d 568, 577-78 (D. Conn. 2016) (same). *Linardos v. Juthani*, No. 3:24-cv-962 (VAB), 2025 WL 887693, at *19 (D. Conn. March 21, 2025) (dismissing the Plaintiff's Section 31-51q claims against Connecticut under the Eleventh Amendment); *Cromartie*, WL 4237072, at *2-3 (same).

Because the Eleventh Amendment bars the State of Connecticut from having to answer Brock's CFEPA and Section 31-51q claims in federal court, Counts Four and Six of the complaint are DISMISSED.

### E.  Claims Against Lori Orend

Brock brings two counts against Lori Orend: a count of battery under state law and a claim of First Amendment retaliation under 42 U.S.C. § 1983.

---

[6] Brock cites no cases to suggest dismissal on these counts would be improper. Instead, Brock cites *Bracey v. Board of Educ. of City of Bridgeport* to support the proposition that claims under Section 31-51q ordinarily raise a federal question "sufficiently substantial to sustain subject matter jurisdiction." ECF No. 32 at 11 (citing *Bracey v. Board of Educ. of City of Bridgeport*, 368 F.3d, 108, 114 (2d Cir. 2004)). I do not dispute *Bracey*'s holding, but *Bracey* does not address the Eleventh Amendment. The Court in *Bracey* was able to exercise jurisdiction over the Section 31-51q claim because the Defendant was a municipality, not the State. *See Cromartie*, 2022 WL 4237072, at *3 ("Plaintiff urges reliance on *Bracey* . . . Defendant correctly points out that *Bracey* is inapposite because it concerned a municipality, not a state, which meant the Eleventh Amendment was not at issue.").

<u>The Battery Claim</u>

The sufficiency of Brock's battery claim has already been addressed. Judge Haight, in his ruling granting Brock permission to amend her complaint, "review[ed] the battery claim against Orend to determine whether it states a plausible claim . . . ." ECF No. 25 at 6. He determined that it did. *Id.* at 9. I agree with Judge Haight, and Orend does not move to dismiss the battery claim. The battery claim may therefore proceed.

<u>The First Amendment Retaliation Claim</u>

Brock alleges that Orend "retaliated against Plaintiff in violation of 42 U.S.C. § 1983 and the First Amendment to the U.S. Constitution." ECF No. 27 at 15. In response, Orend argues that Brock has failed to state a Section 1983 claim against her. I agree.

42 U.S.C. § 1983 permits suits against government employees acting "under color of" state law when those employees violate rights secured by the Constitution or laws of the United States. This includes instances where a government employee retaliates against an individual for exercising her First Amendment rights. To state a First Amendment retaliation claim, a plaintiff must plausibly allege that: "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. School Dist.*, 654 F.3d 267, 272 (2d Cir. 2011). Moreover, because Brock brings her action against an individual under Section 1983, she must allege that the defendant was "personally involved" with the First Amendment violation. *See Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

20

As to the first element, free speech protections are reduced in the government workplace. *See Lynch v. Ackley*, 811 F.3d 569, 577 (2d Cir. 2016) ("[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."). In determining whether a government employee's speech is protected, Courts must strike a balance between the employee's speech interest and the need for a properly functioning work environment. *Id.* ("Courts must weigh the employee's speech interests against the government's interest in effective and efficient fulfillment of its responsibilities to the public, including promoting efficiency and integrity in the discharge of official duties, and maintaining proper discipline in public service.") (internal quotations and alterations omitted). Accordingly, the Supreme Court has held that a public employee's First Amendment right extends only to speech addressing "matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). To constitute speech on a matter of public concern:

> an employee's expression must be fairly considered as relating to any matter of political, social, or other concern to the community. Speech that, although touching on a topic of general importance, primarily concerns an issue that is personal in nature and generally related to the speaker's own situation . . . does not address matters of public concern.

*Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (internal quotations, alterations, and citations omitted).

DMHAS argues that the complaints filed with its Affirmative Action Office fail to address a matter of public concern. DMHAS asserts that "a petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context," ECF No. 40-1 at 6-7, and that "brief references to discrimination are insufficient to transform Plaintiff's concerns for her own career and treatment into speech on a matter of public concern." *Id.* at 7 (citing *Beauchine v. City of Syracuse, New York*, No. 5:21-cv-00845 (BKS) (TWD), 2022 WL 561548, at *14 (N.D.N.Y.

Feb. 24, 2022)). I agree. Brock doesn't allege the substance of these internal complaints,[7] and she does not contest that internal complaints about employment grievances do not constitute speech on matters of public concern. It is reasonable to infer that these internal complaints contained similar allegations to those found in Brock's operative complaint—allegations primarily associated with personal grievances. Brock's allegation that she was given conflicting instructions, ECF No. 27 ¶ 10, inadequate training, *id.* ¶ 11, and "special rules" to follow, *id.* ¶ 17, amount to a compendium of mistreatments related to her individual workplace conditions. Thus, Brock's internal discrimination complaints were not protected speech. She has therefore failed to state a First Amendment retaliation claim.

Brock argues that her subsequent complaints to the Connecticut Commission on Human Rights and Opportunities, especially her whistleblower complaints, did address matters of public concern. *See* ECF No. 41 at 3-6. But Brock did not file these complaints until after she was transferred and Orend—the only defendant on this claim—ceased to be her supervisor. As the operative complaint indicates, each transfer to a new office came with a new supervisor. The complaint notes that "the supervisor in the Hartford office barely spoke" to Brock, ECF No. 27 ¶ 36, and that her supervisor in the Middletown office, Cheryl Janes, ignored Brock's injuries after she fell. *Id.* ¶¶ 66-69. Brock's first complaint with the Commission was filed on May 22, 2019, *id.* ¶ 37, *after* Brock was transferred to the Hartford office on April 9, 2019, *id.* ¶ 30, and after her *new* supervisor allegedly gave her the cold shoulder. *Id.* ¶ 35.  Brock does not allege any facts suggesting that Orend took retaliatory action against her after she was transferred in April 2019. And the complaint alleges no facts that would permit me to reasonably infer that Orend was somehow able to adversely affect Brock's working conditions after Orend ceased to be her

---

[7] Brock alleges only that her two initial complaints regarded "the toxic discriminatory environment the Defendant was creating." ECF No. 27 ¶ 21.

supervisor. Thus, as to the filing of the complaints with the Commission, Brock has failed to allege that Orend took an adverse action against her in response, and those later-in-time complaints could not have caused any adverse actions Orend took against her while Orend and Brock worked together in the Norwich office. Because Brock has failed to state a First Amendment retaliation claim against Orend, I DISMISS Count Seven with prejudice.

### IV.      CONCLUSION

Brock may proceed on her Title VII retaliation claim against DMHAS. Furthermore, because Orend is a DMHAS employee and the battery claim against Orend arises from "a common nucleus of operative fact," *see United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966), the Court has supplemental jurisdiction, and Brock may proceed with that claim as well. All other claims are DISMISSED. As to the discrepancy between Brock's motion to amend and the operative complaint Brock filed, counsel for Brock, Cynthia R. Jennings, is ordered to show cause why I should not impose sanctions, specifically, the imposition of the attorneys' fees associated with responding to Counts Six and Seven of the complaint, for the improper addition of those counts. Attorney Jennings shall respond to this order on or before September 5, 2025.


IT IS SO ORDERED.


                                             _____/s/_____
                                                   Michael P. Shea, U.S.D.J.


Dated: Hartford, Connecticut
           August 22, 2025

23